UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEREMY S., | Case No.:  23-cv-00184-AJB-JLB |
| Plaintiff, | **REPORT AND RECOMMENDATION REGARDING PLAINTIFF'S MERITS BRIEF** |
| v. | |
| MARTIN O'MALLEY, Acting Commissioner of Social Security, | |
| Defendant.[1] | **(ECF No. 9)** |

   This Report and Recommendation is submitted to the Honorable Anthony J. Battaglia, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1) and General Order 707 of the United States District Court for the Southern District of California.

   On January 31, 2023, plaintiff Jeremy S. ("Plaintiff") filed a Complaint pursuant to 42 U.S.C. § 405(g) seeking judicial review of a decision by the Commissioner of Social

---

[1]   Martin O'Malley, the current Acting Commissioner of Social Security, is automatically substituted as defendant for Kilolo Kijakazi, the former Acting Commissioner of Social Security, pursuant to Federal Rule of Civil Procedure 25(d).  *See* Fed. R. Civ. P. 25(d).

Security ("Commissioner") denying his application for a period of disability and disability insurance benefits and supplemental security income benefits ("SSI").  (ECF No. 1.)

Now pending before the Court and ready for decision is Plaintiff's merits brief. (ECF No. 9.)  The Commissioner filed an opposition (ECF No. 13), and Plaintiff filed a reply (ECF No. 14).  For the reasons set forth herein, the Court recommends that Plaintiff's merits brief be **GRANTED**, and that Judgment be entered reversing the decision of the Commissioner and remanding this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

## I.    PROCEDURAL BACKGROUND

On or about February 22, 2020, Plaintiff filed an application for SSI under Title XVI of the Social Security Act, and an application for a period of disability and disability insurance benefits under Title II of the Social Security Act, alleging disability beginning June 1, 2014.[2]  (Certified Administrative Record ("AR") at 185–94, 195–97.)  After his application was denied initially and upon reconsideration (AR 130–134, 137–43), Plaintiff requested an administrative hearing before an administrative law judge ("ALJ") (AR 144–45).  An administrative hearing was held on July 7, 2021.  (AR 37–58.)  Plaintiff appeared at the hearing with counsel, and testimony was taken from him, as well as from a vocational expert ("VE").  (AR 37–58.)

As reflected in his March 11, 2022, hearing decision, the ALJ found that Plaintiff had not been under a disability, as defined in the Social Security Act, from June 1, 2014, through the date of decision.  (AR 13–32.)  The ALJ's decision became the final decision of the Commissioner on January 12, 2023, when the Appeals Council denied Plaintiff's request for review.  (AR 1–6.)  This timely civil action followed.  (ECF No. 1.)

## II.    SUMMARY OF THE ALJ'S FINDINGS

In rendering his decision, the ALJ followed the Commissioner's five-step sequential

---

[2]    During the administrative hearing, Plaintiff's counsel amended the alleged onset date to May 17, 2018.  (AR 42.)

evaluation process. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since June 1, 2014, the alleged onset date. (AR 19.)

At step two, the ALJ found that Plaintiff had the following severe impairments: a depressive disorder, a bipolar disorder, an anxiety disorder, and a cannabis dependence disorder. (AR 19.)

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Commissioner's Listing of Impairments. (AR 19–20.)

Next, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform a "full range of work at all exertional levels"; however, he would have the following non-exertional limitations: "he would be limited to simple, repetitive jobs in a non-public work environment." (AR 20–29.)

For purposes of his step four determination, the ALJ determined that Plaintiff is unable to perform any past relevant work. (AR 29–30.)

The ALJ then proceeded to step five of the sequential evaluation process. Based on the VE's testimony that a hypothetical person with Plaintiff's vocational profile and RFC could perform the requirements of occupations that exist in significant numbers in the national economy (*e.g.*, mail clerk, order filler and order selector), the ALJ found that Plaintiff was not disabled under the law from June 1, 2014, through the date of decision. (AR 30–32.)

## III.   PLAINTIFF'S CLAIMS OF ERROR

As reflected in Plaintiff's merits brief, the disputed issues that Plaintiff is raising as the grounds for reversal and remand are as follows:

1.   Whether the ALJ properly evaluated Plaintiff's symptom testimony. (ECF No. 9 at 4.)

2.   Whether the ALJ properly evaluated the medical opinions from Plaintiff's treating physicians. (*Id.*)

1      3.    Whether the ALJ properly formulated the RFC.  (*Id.*)

2  **IV.**    **STANDARD OF REVIEW**

3      Under 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision to

4  determine whether the Commissioner's findings are supported by substantial evidence and

5  whether the proper legal standards were applied.  *DeLorme v. Sullivan*, 924 F.2d 841, 846

6  (9th Cir. 1991).  Substantial evidence means "more than a mere scintilla" but less than a

7  preponderance.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Desrosiers v. Sec'y of*

8  *Health & Human Servs.*, 846 F.2d 573, 575-76 (9th Cir. 1988).  Substantial evidence is

9  "such relevant evidence as a reasonable mind might accept as adequate to support a

10  conclusion." *Richardson*, 402 U.S. at 401.  This Court must review the record as a whole

11  and consider adverse as well as supporting evidence.  *Green v. Heckler*, 803 F.2d 528, 529-

12  30 (9th Cir. 1986).  Where evidence is susceptible of more than one rational interpretation,

13  the Commissioner's decision must be upheld.  *Gallant v. Heckler*, 753 F.2d 1450, 1453

14  (9th Cir. 1984).  In reaching his findings, the ALJ is entitled to draw inferences which

15  logically flow from the evidence.  *Id.*

16  **V.**    **DISCUSSION**

17      **A.**    **The ALJ Did Not Err in Rejecting Plaintiff's Symptom Testimony**

18          1.    <u>Parties' Arguments</u>

19      Plaintiff argues that the ALJ erred in evaluating Plaintiff's subjective symptom

20  testimony because he failed to give specific, clear, and convincing reasons for rejecting his

21  testimony.  (ECF No. 9 at 16–23.)  Plaintiff addressed each of the eight reasons given by

22  the ALJ for rejecting Plaintiff's symptom testimony.  (*Id.*)  The Commissioner argues that

23  the ALJ did not err in discounting Plaintiff's claims and properly found they were at odds

24  with the longitudinal record and did not deserve full weight.  (ECF No. 13 at 6–8.)

25          2.    <u>Legal Standard</u>

26      An ALJ must engage "in a two-step analysis to determine whether a claimant's

27  testimony regarding subjective pain or symptoms is credible." *Garrison v. Colvin*, 759

28  F.3d 995, 1014 (9th Cir. 2014).  At the first step, "the ALJ must determine whether the

claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* (internal quotation marks and citation omitted).

If the claimant satisfies the first step, and there is no determination of malingering by the ALJ, "the ALJ must provide 'specific, clear and convincing reasons for' rejecting the claimant's testimony regarding the severity of the claimant's symptoms." *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1102 (9th Cir. 2014) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996)); *see also Garrison*, 759 F.3d at 1014–15; *Parra v. Astrue*, 481 F.3d 742, 750 (9th Cir. 2007). The Ninth Circuit "require[s] the ALJ to 'specifically identify the testimony [from a claimant] [the ALJ] finds not to be credible and . . . explain what evidence undermines this testimony.'" *Id.* (quoting *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001)); *see also Lambert v. Saul*, 980 F.3d 1266, 1268 (9th Cir. 2020) ("[T]he ALJ must identify the specific testimony that he discredited and explain the evidence undermining it."); *Smolen*, 80 F.3d at 1284 ("The ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion."); *Parra*, 481 F.3d at 750 ("The ALJ must provide clear and convincing reasons to reject a claimant's subjective testimony, by specifically identifying what testimony is not credible and what evidence undermines the claimant's complaints." (internal quotation marks and citation omitted)).

### 3.   Plaintiff's Symptom Testimony

#### a.   *Hearing Testimony*

Plaintiff's alleged onset date is May 17, 2018, the date of his 5150 hold. (AR 42.)[3] He was 43 years old on this date. During the telephonic administrative hearing on July 7, 2021, Plaintiff testified as follows:

---

[3]   As stated above, during the hearing, the ALJ granted Plaintiff's motion to amend the alleged onset date to May 17, 2018; however, in his decision, the ALJ only referred to the original alleged onset date of June 1, 2014. (AR 16, 30, 42.)

Plaintiff previously had a successful career in IT that involved taking business systems up.  (AR 44, 52.)  His successful career came to a crashing end in late 2014 and "really brought the world down around [Plaintiff]" and he has "never really recovered." (AR 44.)  Plaintiff last worked in the Fall of 2017.  (AR 43.)  He worked for two months but was let go because of "personality behaviors and the rest."  (AR 43.)  He later specified that he was fired for cause due to "personality issues" and "anger management issues." (AR 44.)

Plaintiff was admitted to the hospital in May 2018 for being suicidal.  (AR 44.) When asked by the ALJ why he told his doctors at the time that he was not really suicidal and was just saying that to get his dad's attention, Plaintiff stated that he loses control of his senses and that causes him to lie sometimes and stress "really does it for [him]."  (AR 44.)  When asked by the ALJ why Plaintiff told a doctor in 2018 that "I haven't worked steadily since 2014 and I have no interest, no real interest in working," Plaintiff responded as follows:

> I was collecting unemployment through the end of 2015.  I started and stopped.  I was let go from two different jobs in 2016.  I then got a job with Starbuck's to have some kind of income coming in.  I was let go from that in Spring of 2017.  I didn't bother, end of Summer of 2017, and then I had to come out here to get a job.  Excuse me.  And when I got the job in October of 2018, it started out okay, but my ability to concentrate, my ability to put things together to find solutions, to actually do what I thought I could do, and I found out the hard way that I could not.  And this is my third time, that I'm trying to do something with my skills, being the other two jobs, I lost in 2016 were IT related jobs.  But again, you know, it's like trying to put a square peg to a round hole.  I tried so many times to make this work, and it's not working. You know I've been in group therapy.  Psychiatric care for the last two years, just trying to you know just do something to put my life back together, and it's been one external event that goes on, but really can't get me to a state where I can manage it, but if I'm not cured, I'm not anywhere near what I used to be.  I was very angry at the hospital.  My dad had assisted me, and it wasn't the first time.  I was generally pissed off because I wasn't getting any kind of attention that I needed.  . . .

(AR 45–46.)

Plaintiff added that he gets angry when his father ignores him.  (AR 46.)  At the time, Plaintiff got angry with his dad when he threatened to cut off his marijuana money if he did not go to therapy.  (AR 46.)  Plaintiff has smoked marijuana for a decade.  (AR 46.)  His dad has supplied him with bus money and marijuana money.  (AR 46.)  Plaintiff plans to reimburse his dad if he gets disability.  (AR 47.)

Plaintiff claims his mental and physical health issues are related.  (AR 47.)  Due to his mental health, his whole body feels bad, he has trouble sleeping, trouble eating, and trouble concentrating.  (AR 47.)  During times of stress, Plaintiff experiences intense anxiety.  (AR 48.)  A fight with his dad will leave him dry heaving.  (AR 48.)  Plaintiff used to be able to handle stress, but now it sends him over the edge.  (AR 49.)  On one occasion, Plaintiff slept on the street due to the situation at home with his dad.  (AR 48.)  He got out of the house because he was going to explode.  (AR 48.)

On examination by his own attorney, Plaintiff stated that the thought of taking his own life is there constantly because "when you feel like you're in a corner with nothing to lose, it's hard to know that sometimes there's another way out, and I struggle with that a lot."  (AR 49.)  Plaintiff does not have plans to commit suicide, it is just a feeling he struggles with.  (AR 49.)

Plaintiff gets along with his doctors "okay," but he does not have a lot of interaction with other people.  (AR 49.)  He does not have a car, so he uses the bus.  (AR 49.)

Plaintiff takes Prazitone for nightmares.  (AR 50.)  He has nightmares of his children being taken away and about past childhood abuse.  (AR 52–53.)  In the past, he self-medicated to take care of it.  (AR 53.)  Plaintiff also takes lamotrigine for mood.  (AR 50.)  Plaintiff does not drink alcohol.  (AR 53–54.)

With respect to his concentration and focus, Plaintiff has trouble focusing on things.  (AR 51.)  He tries to occupy his time on things like YouTube.  (AR 51.)  He has to break stories up into pieces and read only a few pages at a time because it is hard to keep his thoughts together.  (AR 51.)  Plaintiff states that he cannot currently take care of his two children.  (AR 51.)  He cannot be in the moment and try to make plans because his mind

"goes sideways" and he starts thinking about things "that have happened in the past" and "might happen in the future." (AR 51.) He gets distressed trying to concentrate. (AR 52.)

### b. *Function Report*

On March 24, 2020, Plaintiff submitted a Function Report—Adult. (AR 241–49.) Plaintiff claimed his PTSD, Bipolar Type 2, severe depression, and severe anxiety limit his ability to work. (AR 242.) His sleep is poor, which affects his ability to concentrate. (AR 242–43.) He has panic and anxiety attacks, cannot drive, and small problems overwhelm him. (AR 242.) Plaintiff is also quick to anger, has to focus on small tasks, lacks motivation, and naps frequently. (AR 242.)

Plaintiff's daily activities include napping, eating, watching TV and YouTube, going outside to get fresh air, and smoking pot. (AR 243.) He also reads, listens to music, and plays video games. (AR 246.) He struggles with remembering to dress and bathe himself, puts his clothes on backwards, and finds cooking too hard so he relies on frozen meals. (AR 243–44.) Plaintiff uses a pill organizer to remember his medications and his dad prompts him to pay attention to his personal needs and do the laundry. (AR 244.)

Plaintiff goes outside two to three days per week. (AR 245.) He walks and uses public transportation. (AR 245.) He can go out alone and handle shopping in stores for household items and groceries, but he does not drive because it gives him anxiety, people drive too fast, and he has poor vision. (AR 245.) Plaintiff's social activities include weekly group therapy, doctor's appointments, going to the grocery store, and picking up his prescriptions. (AR 246.)

Plaintiff is not able to pay the bills, handle a savings account, or use a checkbook or money order, but he can count change. (AR 245.) Handling money causes him anxiety and makes him nervous, but he also has no money. (AR 245–46.) Plaintiff does not handle stress well. (AR 248.) It "freaks him out" and causes panic attacks. (AR 248.) Changes in routine upset him and sometimes anger him. (AR 248.) He is afraid of strangers and fears being homeless again. (AR 248.)

///

Plaintiff has problems getting along with others because he has no filter and upsets most people.  (AR 247.)  His social circle is gone and most of his friends are emotionally distant.  (AR 247.)  He is lonely a lot.  (AR 247.)  He does not get along with authority figures well.  (AR 248.)  He got laid off because a coworker disliked him, and the two of them began to have "episodes" in meetings.  (AR 248.)  Both were fired.  (AR 248.)

Plaintiff's ability to talk, concentrate, complete tasks, understand, follow instructions, get along with others, and remember are affected by his conditions.  (AR 247.)  He frequently loses words, cannot focus on talking, walks upstairs and forgets why, has no speech filter and upsets others, and finds standardized forms lose meaning and appear to be a foreign language.  (AR 247.)  Plaintiff can pay attention for ten minutes on a good day and does not finish what he starts.  (AR 247.)

### 4.   ALJ's Decision

In his decision, in analyzing the RFC, the ALJ summarized the medical record, evaluated the medical opinions in the record, and considered the function reports submitted by Plaintiff and his father.  (AR 20–29.)  He then stated that he considered Plaintiff's symptom testimony; however, to the extent that Plaintiff alleged he could not perform work at the RFC "as recited above," the ALJ found those allegations to be "not totally consistent with the evidence for the following specific and legitimate reasons":

> **First**, the claimant's activities of daily living include; independently caring for his own personal hygiene; performing some light household chores; performing laundry duties; driving a vehicle; playing videogames and watches science videos on the television (Exhibits 4E and 5E).  These activities do not indicate a disabling level of impairment of the claimant's residual functional capacity.
>
> **Second**, when the claimant was admitted to the Tri-City Medical Center psychiatric unit on May 16, 2018, for suicidal threats, it was noted that the claimant acknowledged "anger issues," and he became enraged when he felt ignored by his father and so the threatened suicide.  He explained, "When he ignores me, I have to say crazy things to get his attention. I got his attention, but he just called the police."  He said he had no intent to kill himself.  Such

contradiction in statements by the claimant calls the veracity of all of his statements into question.

**Third**, the claimant stated that he could not work because of "anger" and, in any case, he did not want to return to work.  Therefore, it would appear as if the claimant was attempting to get put on disability in order to get out of working.  This would not be consistent with a disabling level of impairment.

**Fourth**, on October 24, 2018, when the claimant was seen in follow-up with Dr. Panicker, the doctor noted that the claimant was screened for depression and anxiety; his score on the PHQ-9 was 9, indicating only mild depression and on the GAD-7 he achieved a total score of 9, indicating only mild anxiety.  This would not be consistent with a disabled level of impairment.

**Fifth**, when the claimant was seen in a telehealth follow-up with Dr. Donnelly on September 4, 2020, it was noted that the claimant reported that he had "been ok"; his energy level was described as, "it's ok, I can get things done"; he reported that he was still doing his own laundry; he was eating regularly, stating "and it's not garbage"; and he denied having any nightmares.

**Sixth**, Dr. Donnelly completed a short-form evaluation for mental disorders on October 12, 2020, he opined that the claimant would have a good ability to understand, remember and carry out simple instructions and a fair ability to interact appropriately with the public.

**Seventh**, the claimant was a no-show for his appointments with Dr. Donnelly on October 16, 2020, and again on February 24, 2021, after which it was noted that they last saw the claimant in September 2020.

**Eighth**, the objective evidence of the claimant's medical record does not establish impairments likely to produce disabling pain or other limitations as alleged for any period of 12 or more continuous months.

(AR 28–29.)

The ALJ then concluded that although he found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, he found that Plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms are not entirely consistent with the medical evidence and other evidence in the record.  (AR 29.)  The Court will address the reasons identified by the ALJ below.

5. <u>Analysis</u>

a. *Daily Activities*

The ALJ pointed to Plaintiff's daily activities as a reason for discounting his symptom testimony. (AR 28.) "Engaging in daily activities that are incompatible with the severity of symptoms alleged can support an adverse credibility determination." *Ghanim v. Colvin*, 763 F.3d 1154, 1165 (9th Cir. 2014); *see also Revels v. Berryhill*, 874 F.3d 648, 667 (9th Cir. 2017) ("[I]nconsistent daily activities may provide a justification for rejecting symptom testimony[.]"); *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007) (stating that a contradiction between a claimant's daily activities and his or her testimony is a ground for forming the basis of an adverse credibility determination). In other words, a court may consider inconsistencies between a claimant's words and his actions. *See Fair v. Bowen*, 885 F.2d 597, 604 (9th Cir. 1989), *superseded on other grounds by* 20 C.F.R. § 404.1502(a); *see also Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) ("Only if the level of activity were inconsistent with [the c]laimant's claimed limitations would these activities have any bearing on [the c]laimant's credibility."). However, "the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability." *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001). A claimant "does not need to be utterly incapacitated in order to be disabled." *Id.* (internal quotation marks and citation omitted).

Daily activities may also "be grounds for an adverse credibility finding 'if a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting.'" *Orn*, 495 F.3d at 639 (quoting *Fair*, 885 F.2d at 603). To meet this standard, the ALJ "must make 'specific findings relating to [the daily] activities' and their transferability [to a work setting] to conclude that a claimant's daily activities warrant an adverse credibility determination." *Id.* (quoting *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005)).

///

Here, the ALJ noted that Plaintiff's activities of daily living include: "independently caring for his own personal hygiene; performing some light household chores; performing laundry duties; driving a vehicle; playing videogames[;] and watch[ing] science videos on the television." (AR 28 (citing Exs. 4E, 5E).) The ALJ concluded that "[t]hese activities do not indicate a disabling level of impairment." (AR 28.) The ALJ also pointed out that when Plaintiff was seen in a telehealth follow-up with John Donnelly, M.D., one of Plaintiff's treating psychiatrists, on September 4, 2020, it was noted that he reported that he had "been ok"; his energy level was described as, "it's ok, I can get things done"; he reported that he was still doing his own laundry; he was eating regularly, stating "and it's not garbage"; and he denied having any nightmares. (AR 28, 459.)

Although the ALJ did not explain how the majority of the activities he identified are inconsistent with Plaintiff's claimed symptoms or are transferrable to a work setting, the ALJ reasonably pointed to Plaintiff's ability to watch science videos (which the ALJ had previously noted were on technical subjects, such as astronomy and science, and on which Plaintiff was able to stay focused for thirty minutes) to be inconsistent with Plaintiff's claimed mental limitations, specifically his claimed inability to focus and concentrate. (*See* AR 20, 24, 27, 28.) In Plaintiff's February 26, 2021 treatment notes, Dr. Donnelly noted that Plaintiff reported that he watches "videos on technical subjects – such as astronomy and science" and he "likes the videos because [he can] stay focused on [the] video for [a] half hour on a topic that interests him." (AR 466.) In other places, Plaintiff reported that he is able to focus on things "if he is interested in it." (AR 441.) For example, he can play a game for an hour, but must take breaks due to eye strain. (AR 441.) Accordingly, the Court finds this is a specific, clear, and convincing reason for rejecting Plaintiff's testimony regarding the severity of his symptoms.

### b.  *Inconsistent Statements*

Next, the ALJ pointed to Plaintiff's inconsistent statements to undermine his symptom testimony. (AR 28.) An ALJ may consider inconsistencies in a claimant's testimony in assessing credibility. *See Thomas v. Barnhart*, 278 F.3d 947, 958–59 (9th

Cir. 2002); *but see Trevizo v. Berryhill*, 871 F.3d 664, 678 n.5 (9th Cir. 2017) ("[A]ssessments of an individual's testimony by an ALJ are designed to 'evaluate the intensity and persistence of symptoms after [the ALJ] find[s] that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms,' and not to delve into wide-ranging scrutiny of the claimant's character and apparent truthfulness." (quoting Social Security Ruling ("SSR") 16-3p, 2017 WL 5180304, at *1 (Oct. 25, 2017))).

Here, the ALJ pointed out that when Plaintiff was admitted to the Tri-City Medical Center psychiatric unit in May 2018 for suicidal threats, "it was noted that [he] acknowledged 'anger issues,' and he became enraged when he felt ignored by his father and so the threatened suicide." (AR 28.) The ALJ further pointed out that Plaintiff explained, "'When [my father] ignores me, I have to say crazy things to get his attention. I got his attention, but he just called the police.' He said he had no intent to kill himself." (AR 28.) The underlying treatment note further stated that Plaintiff "has made similar threats in the past but never attempted suicide." (AR 292.) The ALJ concluded that such a contradiction in statements by Plaintiff calls the veracity of all his statements into question. (AR 28.)

During the hearing, when questioned about his prior statements by the ALJ, Plaintiff explained that he "wasn't lying to [the hospital]," he just "really lose[s] . . . control of [his] senses [and] that causes [him] to lie sometimes and stress really does it for [him]." (AR 44.) He later stated that he was "very angry at the hospital" and was "generally pissed off because [he] wasn't getting any kind of attention that [he] needed." (AR 46.) He gets angry when his father ignores him. (AR 46.)

Based on the foregoing, the Court finds that the ALJ permissibly relied on Plaintiff's statements that he lied to the hospital about his suicidal threats because he was mad at his father and wanted attention to undercut the severity of Plaintiff's testimony regarding his symptoms, specifically those related to depression and suicidal thoughts. Although Plaintiff argues that the ALJ is impermissibly assessing Plaintiff's overall character and

truthfulness in violation of SSR 16-3p, the ALJ is still entitled to rely on inconsistencies between Plaintiff's statements and his symptom testimony. *See* SSR 16-3p, 2017 WL 5180304, at \*11 (ALJs may still evaluate an individual's statements about his or her symptoms); *Smartt v. Kijakazi*, 53 F.4th 489, 497–99 (9th Cir. 2022) (finding the ALJ permissibly relied on discrepancies in the plaintiff's testimony). Moreover, the ALJ is not assessing Plaintiff's general propensity for truthfulness in all areas, but his reliability when it comes to his symptom testimony specifically, especially where Plaintiff testified that his impairments cause him to lie under stress and he specifically admitted to lying about his symptoms. Accordingly, the Court finds this is a specific, clear, and convincing reason for rejecting Plaintiff's testimony regarding the severity of his symptoms.

### c. *Inconsistent Treatment*

The ALJ also relied on the fact Plaintiff was a no-show for his appointments with Dr. Donnelly on October 16, 2020, and again on February 24, 2021, after which it was noted that he last saw Plaintiff in September 2020, to discount his symptom testimony. (AR 29.) A claimant's course of treatment, including an inadequately explained failure to seek treatment, is a relevant factor for the ALJ to consider when assessing the claimant's symptom reports. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). Yet, the ALJ must take into consideration whether the claimant had good cause for not seeking treatment, including whether the mental impairment contributed to him not seeking rehabilitation. *See Garrison*, 759 F.3d at 1018 n.24 (holding an ALJ may not reject a claimant's symptom testimony based on a lack of treatment if "the record affords compelling reason to view such departures from prescribed treatment as part of claimants' underlying mental afflictions"); *Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294, 1299–1300 (9th Cir. 1999) ("[I]t is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." (citation omitted)); *Fair*, 885 F.2d at 603–04; SSR 18-3p, 2018 WL 4945641, at \*4–6 (Oct. 2, 2018) (the determination of whether a claimant failed to follow prescribed treatment involves an assessment of good cause on a case-by-case basis).

Here, Plaintiff saw Dr. Donnelly or Dr. Chung-Lim Kim, another psychiatrist on staff, approximately once a month beginning in April 2018, through April 2021, the last available record.  (AR 381–473.)  In 2020, that frequency stretched to every six to seven weeks and then went back to four to six weeks in 2021.  (AR 445, 449, 452, 469.)  In that time, Plaintiff missed appointments in May and October 2018, but made them up later, and no-showed twice between July 2019 and November 2019.  (AR 438.)  Plaintiff's March 2020 appointment was cancelled due to COVID.  (AR 448.)  Plaintiff later no-showed for his October 2020 and February 2021 appointments.  (AR 462, 464.)

At a subsequent appointment he attended in February 2021, Plaintiff reported that he had still been taking all his medications daily.  (AR 465.)  He further reported in the context of his poor attendance that he was having ongoing difficulties with dysphoria and anxiety especially in the context of his current legal issues, while also attending groups and clinic and working with an individual therapist.  (AR 466.)  Dr. Donnelly noted that although Plaintiff was not consistent with his medication management appointments, he had been continuing with his therapist.  (AR 464.)  Mark H. Allen, Ph.D., one of Plaintiff's treating psychologists, separately reported that Plaintiff saw him weekly beginning on August 28, 2020.  (AR 475.)

Based on the foregoing, the Court finds that Plaintiff regularly sought multiple forms of treatment on a continuing basis.  The fact he missed a few appointments does not indicate that his symptoms were not severe or were otherwise resolved.  Accordingly, the Court does not find this to be a specific, clear, and convincing reason for rejecting Plaintiff's testimony regarding the severity of his symptoms.

### d.   *Disabling Limitations*

Next, the ALJ pointed out that the objective evidence in Plaintiff's medical record does not establish impairments likely to produce disabling pain or other limitations as alleged for any period of twelve or more continuous months.  (AR 29.)  Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which

has lasted or can be expected to last for a continuous period of not less than 12 months."
42 U.S.C. § 423(d)(1)(A).

Here, the ALJ found on March 11, 2022, that Plaintiff had not engaged in substantial gainful activity since June 1, 2014. (AR 19.) His alleged onset date is May 17, 2018. (AR 42.) The medical record reflects that in January 2019, Edward Surridge, LMFT, indicated Plaintiff's expected length of treatment would be twelve months. (AR 310.) On October 12, 2020, Dr. Donnelly opined that he did not anticipate significant improvement beyond Plaintiff's current levels of function. (AR 457.) On February 22, 2021, Dr. Allen indicated that Plaintiff should be able to return to work in February 2022 and was not permanently disabled. (AR 474.) Gregory M. Nicholson, M.D., a consultative examiner, later opined on February 10, 2022, that Plaintiff's condition was expected to improve in the next twelve months with active treatment. (AR 485.)

The foregoing would suggest that Plaintiff was in active treatment for his mental impairments for twelve or more continuous months, with doctors opining that Plaintiff had limitations beyond those assessed in the RFC for at least that period of time.[4] As the ALJ impermissibly rejected the opinions of Dr. Allen and Dr. Donnelly, as set forth below, the Court finds this is not a specific, clear, and convincing reason for rejecting Plaintiff's testimony regarding the severity of his symptoms.[5]

///

---

[4]    The ALJ's intention in including this reason to reject Plaintiff's symptom testimony is unclear. In the absence of clarity, the Court construes the ALJ's reason as indicating that Plaintiff's symptoms would not last more than twelve months, and therefore he would not meet the statutory definition of disabled.

[5]    Plaintiff construes this reason as improperly addressing physical impairments (ECF No. 9 at 22–23), presumably because of the ALJ's inclusion of the phrase "disabling pain." (AR 29 ("[T]he objective evidence of the claimant's medical record does not establish impairments likely to produce disabling pain or other limitations as alleged for any period of 12 or more continuous months.").) However, the Court construes this reason as addressing Plaintiff's mental limitations, as "disabling pain or other limitations" is a term of art and the ALJ did not evaluate Plaintiff's physical impairments in his decision.

e.   *PHQ-9 and GAD-7 Scores*

Next, the ALJ pointed out that on October 24, 2018, when Plaintiff was screened for depression and anxiety, Plaintiff's score on the PHQ-9 was 9, indicating mild depression, and his total score on the GAD-7 was 9, indicating only mild anxiety.  (AR 28.)  The ALJ determined that these scores would not be consistent with a disabled level of impairment. (AR 28.)

The PHQ-9 refers to a specific patient health questionnaire that "is a[n] instrument for making criteria-based diagnoses of depressive and other mental disorders commonly encountered in primary care."  *Norman v. Berryhill*, No. 17-CV-04108-SI, 2018 WL 4519952, at *2 n.3 (N.D. Cal. Sept. 19, 2018) (citing Kurt Kroenke, MD, et al., *The PHQ-9: Validity of a Brief Depression Severity Measure*, 16 J. Gen. Intern. Med. 606 (2001), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1495268      [https://perma.cc/ECD6-PG4V]).  PHQ-9 scores are generally interpreted as follows: minimal depression (0–4); mild depression (5–9); moderate depression (10–14); moderately severe depression (15–19); and severe depression (20–27).  *See Mae v. Saul*, No. 1:19-CV-03061-MKD, 2020 WL 3620092, at *6 n.3 (E.D. Wash. Mar. 6, 2020).

The Generalized Anxiety Disorder Questionnaire ("GAD-7") is a questionnaire for screening and measuring generalized anxiety disorder.  *Tokin v. Berryhill*, No. 2:17-cv-01796-RSM-JRC, 2018 WL 6991114, at *4 n.1 (W.D. Wash. Sept. 28, 2018), *adopted by* 2019 WL 157974 (W.D. Wash. Jan. 10, 2019), *aff'd sub nom. Tokin v. Saul*, 796 F. App'x 452 (9th Cir. 2020).  A score in the range 0–4 indicates minimal anxiety and a score of 5–9 indicates mild anxiety.  *Id.*  "Scores of 5, 10, and 15 are taken as the cut-off points for mild, moderate and severe anxiety, respectively.  When used as a screening tool, further evaluation is recommended when the score is 10 or greater."  Generalised Anxiety Disorder Assessment      (GAD-7),      https://patient.info/doctor/generalised-anxiety-disorder-assessment-gad-7 [https://perma.cc/48QZ-BELC].  "The highest possible score, 21, is achieved if the individual endorses the following symptoms occurring nearly every day: feeling anxious, nervous or on edge; not being able to stop or control worrying; worrying

too much about different things; trouble relaxing; being so restless that it is hard to sit still; becoming easily annoyed or irritated; and feeling afraid, as if something awful might happen." *Cardona v. Kijakazi*, No. 20-cv-226-BLM, 2022 WL 1214707, at *12 n.8 (S.D. Cal. Apr. 25, 2022) (citation omitted).

Here, the Court acknowledges that on October 24, 2018, Plaintiff's PHQ-9 score indicated mild depression. (AR 335.) However, over the course of 2018 and 2019, Plaintiff's PHQ-9 score ranged from 9 to 15, which indicates moderately severe depression, and went as high as 25, which indicates severe depression. (*See* AR 329, 333, 345, 348, 350, 352, 354, 360, 364.) The Court further acknowledges that on October 24, 2018, Plaintiff's GAD-7 score was 9, indicating mild anxiety. (AR 335.) However, over the course of 2018 and 2019, Plaintiff's GAD-7 score ranged from 7 to 11 to 18, and went as high as 21, which is the highest possible score. (*See* AR 330, 345, 350, 354, 362.) "[I]t is error to reject a claimant's testimony merely because symptoms wax and wane in the course of treatment." *Garrison*, 759 F.3d at 1017. Accordingly, the Court does not find that this is a specific, clear, and convincing reason for rejecting Plaintiff's testimony regarding the severity of his symptoms.

### f.   *Lack of Motivation to Work*

The ALJ also pointed to Plaintiff's statement that he did not want to return to work to undercut his symptom testimony, stating that "it would appear as if [Plaintiff] was attempting to get put on disability in order to get out of working," and "[t]his would not be consistent with a disabling level of impairment." (AR 28.) Failure to work for reasons other than impairments may be considered by an ALJ in determining the credibility of subjective symptom testimony. *See Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir. 2001), *as amended* (Nov. 9, 2001) (finding the ALJ permissibly relied on statements by the claimant that he left his job because he was laid off rather than injured to disregard his pain testimony); *Thomas*, 278 F.3d at 959 (finding the ALJ permissibly relied on the claimant's poor employment history and "little propensity to work in her lifetime" as grounds for discounting the claimant's testimony).

23-cv-00184-AJB-JLB

Although Plaintiff attempted to return to work in 2016 and 2017 after being fired from a successful career position in 2014, there is no suggestion that he attempted to return to work after his alleged onset date of May 17, 2018.  (AR 42–45, 209.)  On his alleged onset date, Plaintiff informed hospital staff that "he can't work because of 'anger' and, in any case, doesn't want to return to work."  (AR 292.)

Based on the foregoing, the Court finds that the ALJ logically inferred based on Plaintiff's statement that his impairments may not be the sole reason he is unemployed. *See Bruton*, 268 F.3d at 828; *Thomas*, 278 F.3d at 959; *see also Luis M. J. v. Comm'r of Soc. Sec.*, No. 1:17-CV-03195-RHW, 2018 WL 4179102, at *6–7 (E.D. Wash. July 26, 2018) (finding the ALJ permissibly relied on statements by the claimant that he did not want to work full-time in rejecting the claimant's symptom testimony).  Accordingly, the Court finds that this is a specific, clear, and convincing reason for rejecting Plaintiff's testimony regarding the severity of his symptoms.

### g.    *RFC Supported by Objective Evidence*

Lastly, the ALJ pointed out that Dr. Donnelly completed a short-form evaluation for mental disorders on October 12, 2020, in which he opined that Plaintiff would have a good ability to understand, remember and carry out simple instructions and a fair ability to interact appropriately with the public.  (AR 28, 457.)  An ALJ may consider consistency with the objective medical evidence in evaluating symptom testimony.  *See* 20 C.F.R. §§ 404.1529, 416.929.  The limitations opined by Dr. Donnelly are consistent with the assessed RFC, which limits Plaintiff to simple, repetitive jobs in a non-public work environment.  (AR 20.)  The limitations are also generally consistent with the other medical opinions in the record.[6]  Accordingly, the Court finds that this is a specific, clear, and

---

[6]    Dr. Allen assessed more significant limitations in interacting with the public, but he did opine that Plaintiff is "limited but satisfactory" in understanding, remembering, and carrying out very short and simple instructions.  (AR 477.)  Dr. Allen further opined that Plaintiff is "limited but satisfactory" in getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes.  (AR 477.)

convincing reason for rejecting Plaintiff's testimony regarding the severity of his symptoms in these areas.

Overall, the Court finds that certain of the ALJ's credibility determinations are supported by substantial evidence in the record. Any error with respect to some of the reasons articulated by the ALJ is therefore harmless. *See Carmickle*, 533 F.3d at 1162 ("So long as there remains substantial evidence supporting the ALJ's conclusions on . . . credibility and the error does not negate the validity of the ALJ's ultimate [credibility] conclusion, such is deemed harmless and does not warrant reversal." (internal quotation marks and citation omitted)); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2004) (finding that although the ALJ erred in relying on one of several reasons in support of an adverse credibility determination, such error did not affect the ALJ's decision, and therefore was harmless, because the ALJ's remaining reasoning and ultimate credibility determination were adequately supported by substantial evidence in the record).

Plaintiff generally testified that he cannot work due to his inability to focus and concentrate, his panic and anxiety attacks, and his PTSD and depression. However, as pointed out by the ALJ, certain of Plaintiff's daily activities, inconsistent statements, lack of motivation to work, and an objective medical record indicating he can complete simple, repetitive tasks in a non-public work environment belie the alleged severity of Plaintiff's symptom testimony. Accordingly, the Court finds that the ALJ did not err in discounting Plaintiff's subjective symptom testimony.

**B.    The ALJ Erred in Evaluating the Medical Opinions of Dr. Donnelly and Dr. Allen**

1.    Parties' Arguments

Plaintiff argues that the ALJ erred in evaluating the opinions of John Donnelly, M.D., one of Plaintiff's treating psychiatrists, and Mark H. Allen, Ph.D., one of Plaintiff's treating psychologists. (ECF No. 9 at 5.) Plaintiff argues that the ALJ failed to properly evaluate the supportability and consistency factors with respect to the physicians' opinions. (*Id.* at 7–14.) In response, the Commissioner argues that the ALJ properly evaluated both

factors in finding the opinions of Dr. Donnelly and Dr. Allen unpersuasive, and Plaintiff failed to show any error with the ALJ's reasoning.  (ECF No. 13 at 14–19.)  In his reply, Plaintiff argues that the Commissioner is erroneously relying on reasons not provided by the ALJ in his opinion.  (ECF No. 14 at 2–5.)

### 2.   Legal Standard

Under the revised regulations which apply to claims, such as this one, filed on or after March 27, 2017, an ALJ must evaluate the persuasiveness of all the medical opinions and articulate in the decision his or her assessment as to each.  *See* 20 C.F.R. §§ 404.1520c(b), 416.920c(b).  In evaluating the persuasiveness of a medical opinion, an ALJ will consider the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant, including the length, purpose, and extent of the treatment relationship, frequency of examinations, and examining relationship; (4) specialization; and (5) any other factors that tend to support or contradict the medical opinion, including familiarity with the other evidence in the claim.  *See id.* §§ 404.1520c(c)(1)–(5), 416.920c(c)(1)–(5).  Although an ALJ may discuss each of the factors in his or her opinion, the regulations only require an ALJ to explain how he or she considered the most important factors— supportability and consistency—when determining a medical opinion's persuasiveness, unless two conflicting medical opinions are both equally well-supported and consistent with the record.  *See id.* §§ 404.1520c(b)(2)–(3), 416.920c(b)(2)–(3).

The revised regulations override the Ninth Circuit's treating physician rule, which accorded greater deference to the opinions of treating physicians due to their relationship with the claimant.  The treating physician rule required clear and convincing reasons for rejecting an uncontradicted medical opinion of a treating physician, and specific and legitimate reasons for rejecting a contradicted medical opinion of a treating physician. *Woods v. Kijakazi*, 32 F.4th 785, 789–92 (9th Cir. 2022).  However, "[e]ven under the new regulations, an ALJ cannot reject an examining or treating doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence." *Id.* at 792; *accord Petritz v. Kijakazi*, No. 22-35155, 2022 WL 17592191, at *1 (9th Cir. Dec.

13, 2022); *Jones v. Saul*, No. 2:19-cv-01273 AC, 2021 WL 620475, at *6 (E.D. Cal. Feb. 17, 2021).

In evaluating the persuasiveness of medical opinions, the "most important factors" are "supportability" and "consistency." *See* 20 C.F.R. §§ 404.1520c(a), 416.920c(a); *see also Woods*, 32 F.4th at 791. Supportability means the extent to which a medical source supports the medical opinion by explaining the "relevant . . . objective medical evidence." *See* 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). Consistency means the extent to which a medical opinion is "consistent . . . with the evidence from other medical sources and nonmedical sources in the claim." *See id.* §§ 404.1520c(c)(2), 416.920c(c)(2). An ALJ must "articulate . . . how persuasive" he or she finds "all of the medical opinions" from each doctor or other source, and "explain how [her or she] considered the supportability and consistency factors" in reaching these findings. *See id.* §§ 404.1520c(b), 416.920c(b).

### 3.   Background

#### a.   *Dr. Donnelly's Opinions*

On May 7, 2020, Dr. Donnelly, one of Plaintiff's treating psychiatrists, completed a Mental Disorder Questionnaire Form for Plaintiff. (AR 370–74.) Dr. Donnelly stated that he first examined Plaintiff on May 29, 2018, with the most recent examination being February 3, 2020, and he saw Plaintiff every six weeks. (AR 374.) Dr. Donnelly noted that Plaintiff had been diagnosed with bipolar disorder, chronic PTSD, panic disorder, cannabis dependence, and personality disorder, and was currently taking Seroquel, Effexor, Lamotrigine, and Prazosin for his conditions. (AR 374.)

Plaintiff appeared generally casual and appropriate and was able to get to the appointment without assistance. (AR 370.) Plaintiff appeared calm and made direct eye contact, but he had a restricted affect. (AR 371.)

Plaintiff complained of having a frequent sense of unhappiness, a chronic sense of not wanting to live that is always in the background, periodic states of anger during which he might punch a wall, and concentration that tends to drift a lot. (AR 370.) Plaintiff also complained of having chronic difficulty focusing, even on simple tasks. (AR 373.)

Plaintiff stated that in the past he would have states that lasted three to four days in which he needed less sleep (four to six hours) and experienced excitement and an elevated mood. (AR 370, 372.)   These states would be followed by periods of irritability and racing thoughts.   (AR 372.)   Plaintiff was able to attend to his basic needs and use public transportation.  (AR 372.)

Plaintiff reported that he was last employed from October to December 2017, he was in the process of getting a divorce, and the mother of their daughter would not allow him contact with the child.  (AR 371.)

Plaintiff stated that he has a recurrent history of his attitude causing difficulties for him at work.  (AR 370.)  Plaintiff suffers from an "inability to suffer insults," and has attitude problems which have affected his work.  (AR 373.)  Plaintiff worked for various employers for long stretches (i.e., nine years and five years), but he was let go because of his attitude.  (AR 373.)  He thinks he would lose his temper if someone "got on his neck" at work, which has caused him to lose jobs in the past.  (AR 373.)

Dr. Donnelly noted that efforts at medication management have had limited benefits. (AR 374.)

Five months later, on October 12, 2020, Dr. Donnelly filled out a Short-Form Evaluation for Mental Disorders.  (AR 455–58.) Dr. Donnelly noted that he was still seeing Plaintiff every six to seven weeks, with the most recent visit being on September 4, 2020. (AR 455.)

Plaintiff again presented well-groomed and alert, with normal motor activity, normal and soft speech, cooperative behavior, no behavior disturbances, and a somewhat "passive" quality.  (AR 455.)  However, Plaintiff's affect was also "restricted," and his mood was anxious, depressed, and angry.  (AR 456.)  Plaintiff's judgment was impaired, and he had suicidal preoccupations.  (AR 456.)

Although Plaintiff was assessed as being oriented and having normal memory, he also had impaired concentration.  (AR 455.)  Dr. Donnelly noted that Plaintiff's capacity

23-cv-00184-AJB-JLB

for attention varied depending on the degree to which he was interested in something.  (AR 455.)  Plaintiff noted that he had used cannabis daily since 2018.  (AR 456.)

Dr. Donnelly assessed Plaintiff has having a "good" ability to understand, remember, and carry out simple instructions, but having a "poor"[7] ability to understand, remember, and carry out complex instructions.  (AR 457.)  Dr. Donnelly also assessed Plaintiff has having a "poor" ability to maintain concentration, attention, and persistence, perform activities within a schedule and maintain regular attendance, interact appropriately with supervisors and co-workers, and respond appropriately to changes in a work setting.  (AR 457.)  Dr. Donnelly further assessed Plaintiff as having a "fair"[8] ability to interact appropriately with the public.  (AR 457.)  Dr. Donnelly further opined that Plaintiff is capable of managing funds in his best interest.  (AR 458.)

### b.   *Dr. Allen's Opinions*

On February 22, 2021, Mark H. Allen, Ph.D., one of Plaintiff's treating psychologists, opined on Plaintiff's limitations.  (AR 474.)  Dr. Allen had been treating Plaintiff on a weekly basis since August 28, 2020.  (AR 474–75.)  Dr. Allen opined that Plaintiff was unable to work because of his Bipolar I disorder, depressive type, mood disorder with anxious distress, and PTSD.  (AR 474–75.)  Dr. Allen opined that Plaintiff has "clinically significant impairments in occupational and social functioning."  (AR 474.)  At the time of the opinion, Plaintiff was taking Seroquel, Lamictal, Effexor, and Minipress, which had the side effect of causing mild sedation.  (AR 475.)

Dr. Allen's clinical findings, including those from any mental status examinations, included "clinically significant distress and impairment in social and occupational functioning due to persistent affect dysregulation, depressive feelings, excessive anxiety

---

[7]   "Poor" was defined as follows: "The evidence supports the conclusion that the individual cannot usefully perform or sustain the activity."  (AR 457.)

[8]   "Fair" was defined as follows: "The evidence supports the conclusion that the individual's capacity to perform the activity is impaired, but the degree/extent of the impairment needs to be further described."  (AR 457.)

and worry, social avoidance, intermittent adjustment problem, [and] intrusive/obsessive thinking." (AR 475.) Dr. Allen opined that Plaintiff's prognosis was "fair." (AR 475.)

In checklist form, Dr. Allen opined that Plaintiff's symptoms included depressed mood, sleep disturbance, feelings of guilt or worthlessness, difficulty concentrating or thinking, instability of interpersonal relationships, and distractibility. (AR 476.) Dr. Allen further opined that Plaintiff had significant cognitive decline from a prior level of functioning in one or more of the cognitive areas (*i.e.*, complex attention, executive function, learning and memory, language, perceptual motor, or social cognition). (AR 476.) Plaintiff also had disproportionate fear or anxiety about at least two different situations (*e.g.*, using public transportation, being in a crowd, being in a line, being outside of the home, being in open spaces), frequent distractibility, difficulty sustaining attention and difficulty organizing tasks, and involuntary, time-consuming preoccupation with intrusive, unwanted thoughts. (AR 476.) Dr. Allen further noted that there was medical documentation of all the following: exposure to actual or threatened death, serious injury, or violence, subsequent involuntary re-experiencing of the traumatic event, avoidance of external reminders of the event, disturbance in mood and behavior, and increases in arousal and reactivity. (AR 476.)

With respect to Plaintiff's ability to do work-related activities on a day-to-day basis in a regular setting, Dr. Allen opined that Plaintiff would have no useful ability to function in the following areas: maintaining attention for two-hour segments, maintaining regular attendance and being punctual within customary, usually strict tolerances, dealing with normal work stress, and completing a normal workday and workweek without interruptions from psychologically-based symptoms. (AR 477.) Dr. Allen further opined that Plaintiff would be unable to meet competitive standards in the following areas: working in coordination with or proximity to others without being unduly distracted, and responding appropriately to changes in a routine work setting. (AR 477.) Dr. Allen also opined that Plaintiff would be seriously limited in the following areas: remembering work-like procedures, making simple work-related decisions, performing at a consistent pace without

an unreasonable number and length of rest periods, and accepting instructions and responding appropriately to criticism from supervisors. (AR 477.) Lastly, Dr. Allen opined that Plaintiff would be limited but satisfactory in the following areas: understanding and remembering very short and simple instructions, carrying out very short and simple instructions, asking simple questions or requesting assistance, getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, and being aware of normal hazards and taking appropriate precautions. (AR 477.)

With respect to Plaintiff's mental abilities and aptitudes needed to do semi-skilled or skilled work, Dr. Allen opined that Plaintiff would be unable to meet competitive standards in understanding and remembering detailed instructions, and would have no ability to function with respect to carrying out detailed instructions, setting realistic goals and making plans independently of others, and dealing with stress of semiskilled and skilled work. (AR 478.) Concerning Plaintiff's mental abilities and aptitude to do particular types of jobs, Dr. Allen opined that Plaintiff would be unable to meet competitive standards in using public transportation and being in an unfamiliar place. (AR 478.) He would be seriously limited in interacting appropriately with the general public and maintaining socially appropriate behavior. (AR 478.) He would be limited but satisfactory in adhering to basic standards of neatness and cleanliness. (AR 478.) Dr. Allen explained that Plaintiff had clinically significant impairment in executive functions, including sustained attention and concentration, and was unable to maintain persistent work-related activities. (AR 478.) He further explained that Plaintiff had clinically significant relational distress and social anxiety/avoidance. (AR 478.)

Dr. Allen opined that Plaintiff has extreme limitations in a work setting in remembering information, applying information, concentrating, persisting, and maintaining pace, and adapting in the workplace. (AR 479.) Plaintiff also has marked limitations in a work setting in understanding information, interacting with others, and managing himself in the workplace. (AR 479.) Dr. Allen opined that Plaintiff's

impairments would cause him to be absent from work more than four days per month, and his impairments can be expected to last at least twelve months.  (AR 480.)

### 4.   ALJ's Decision

With respect to Dr. Donnelly's opinions, the ALJ found them unpersuasive, stating:

> It is found that his assessment of significant limitation is inconsistent with his own statements in both forms as well as inconsistent with other evidence in the claimant's medical records as a whole.  For example, it is noted that he assessed the claimant with some significant limitations, but yet opined that the claimant would be capable of managing funds in his own best interest; additionally, he reported in the questionnaire that he completed on May 7, 2020, that he saw the claimant every 6 weeks with the most recent visit being on February 3, 2020, three months earlier.  Therefore, the opinion of Dr. Donnelly is found to be unpersuasive.

(AR 24–25.)

With respect to Dr. Allen's opinions, the ALJ similarly found them unpersuasive, stating:

> The undersigned Administrative Law Judge acknowledges the findings expressed by Dr. Allen in his February 22, 2021, verification of disability form for the claimant and the July 28, 2021, mental impairment questionnaire. It is found that his assessment is inconsistent with his own findings in his examination of the claimant as well as other evidence in the claimant's medical records as a whole.  For example, it is noted that [] despite the severe limitations assessed by Dr. Allen, he still opined that the claimant would be able to manage his funds in his own best interest.  The fact that the claimant would be able to manage funds in his own best interest would not be consistent with someone with a marked to extreme limitation in their ability to understand, remember or apply information or with an extreme limitation in his ability to concentrate, persist or maintain pace, etc.  Additionally, it is noted that Dr. Allen opined that the claimant would be disabled from work, possibly permanently disabled.   The determination that the claimant is disabled is an issue reserved to the Commissioner (20 CFR 404.1527(e) and 416.927(e)) and even treating source opinions on such issues are never entitled to controlling weight or special significance (SSR 96-5p).  Therefore, the opinion of Dr. Allen is found to be unpersuasive.

(AR 25–26.)

5.   <u>Analysis</u>

With respect to the opinions of Dr. Donnelly and Dr. Allen, the Court finds that the ALJ erred in his evaluation of the persuasiveness of each opinion. Specifically, the ALJ erred in how he articulated and supported his consideration of the supportability and consistency factors, as required under the new regulations. *See* 20 C.F.R. §§ 404.1520c(b), 416.920c(b); *Woods*, 32 F.4th at 792. Accordingly, as set forth below, the Court finds that the ALJ erred in rejecting the opinions of Dr. Donnelly and Dr. Allen.

The Court notes first that the ALJ never used the word "supportability" in his analysis of the opinions of Dr. Donnelly and Dr. Allen. However, because the ALJ addressed the purported internal consistency of the opinions, the Court will construe this as a discussion of the support provided for the opinions.

For both Dr. Donnelly and Dr. Allen, the ALJ's supportability analysis primarily relied on the fact that the doctors opined that Plaintiff could manage his funds in his own best interest to reject their opinions. At step three in his decision, the ALJ stated, without citation, that managing funds is a "task that requires significant ability to concentrate, persist and maintain pace." (AR 20.) He later concluded that Dr. Donnelly's opinions were "inconsistent with his own statements in both forms" (AR 24), thus suggesting that Dr. Donnelly's objective findings did not support his opinions and, in fact, were inconsistent with his opinions, *see Woods*, 32 F.4th, at 791–92 ("Supportability means the extent to which a medical source supports the medical opinion by explaining the 'relevant . . . objective medical evidence.'" (quoting 20 C.F.R. § 404.1520c(c)(1))). With respect to managing funds, the ALJ stated that although Dr. Donnelly "assessed [Plaintiff] with some significant limitations," he "opined that [Plaintiff] would be capable of managing funds in his own best interest[.]" (AR 24.) With respect to Dr. Allen, the ALJ similarly stated that Dr. Allen's assessment was "inconsistent with his own findings in his examination of [Plaintiff]," specifically because, "despite the severe limitations assessed by Dr. Allen, he still opined that [Plaintiff] would be able to manage his funds in his own best interest." (AR 25–26.) The ALJ concluded that "[t]he fact that [Plaintiff] would be able to manage

funds in his own best interest would not be consistent with someone with a marked to extreme limitation in their ability to understand, remember or apply information or with an extreme limitation in his ability to concentrate, persist or maintain pace, etc." (AR 26.) For the reasons set forth below, the Court finds that the ALJ did not support his supportability evaluation with substantial evidence.

As Plaintiff noted in his brief, he reported in his SSI application that he was receiving food stamps and had $10 in cash. (AR 190, 192.) During his hearing before the ALJ, Plaintiff testified that he does not have "any income other than the bus pass." (AR 49.) In his Function Report, Plaintiff stated that he cannot handle a savings account, use a checkbook or money orders or pay bills because of anxiety and lack of money, but he can count change. (AR 245.) He also stated that handling money makes him nervous and causes him to feel "panicky." (AR 246.) In a Third Party Function Report, Plaintiff's father agreed with his son's answers, adding that Plaintiff is in collections for delinquent accounts and has no job, no assets, no savings, and no checking or savings accounts. (AR 255.) Given the foregoing, the Court cannot discern, and the ALJ does not explain, how Plaintiff's ability to manage his minimal funds in his own best interest is inconsistent with Dr. Donnelly's opinions. *See Johnson v. Berryhill*, No. C16-205-JCC, 2017 WL 2437606, at *6 (W.D. Wash. June 6, 2017) (finding it was not necessarily inconsistent for a physician to opine that the plaintiff is "capable of managing a small amount of money to buy food or perhaps pay rent once a month but find her incapable of completing tasks in a timely manner on a daily basis as might be required in a work environment with deadlines or production demands"); *Tucker v. Comm'r of Soc. Sec.*, No. 1:13-CV-01212-SAB, 2014 WL 3615493, at *7 (E.D. Cal. July 21, 2014) (observing that "a marked impairment in maintaining normal daily activities may not necessarily be inconsistent with the ability to manage funds").[9]

---

[9]   *See also* Social Security Administration Program Operations Manual System ("POMS") GN 00502.020 ("Unless judged legally incompetent, we presume an adult

The Commissioner suggests that the ALJ's observation was reasonable because someone who was "unable to usefully understand, remember, and carry out complex instructions or maintain attention and persistence would also be expected to reasonably struggle to effectively manage his own finances." (ECF No. 13 at 16–17.) The Commissioner further argues that "the fact that Plaintiff had very little money suggests he had to make difficult choices regarding how to spend that money, which would require an adequate ability to understand and apply information." (*Id.* at 17.) The Court might find the Commissioner's argument persuasive if Plaintiff had more funds, a variety of income streams, or any real expenses or daily activities which would require him to make difficult choices.[10] Plaintiff lives with his father, who provides for him. (AR 46, 64. 75.) Moreover, there is very little apparent connection between maintaining attention and persistence for long periods, and understanding, remembering, and carrying out complex instructions, and paying a set bus fare. *Cf. Mai Yang v. Berryhill*, No. 2:17-CV-1748-EFB, 2018 WL 4611401, at *5 (E.D. Cal. Sept. 26, 2018) (finding that plaintiff's ability to count change and carry out other limited daily activities was not inconsistent with her physician's opinion that she had a poor ability to perform several work-related activities).

The ALJ further stated that Dr. Donnelly's opinions were inconsistent because while he claimed on May 7, 2020, that he saw Plaintiff "every six weeks," Plaintiff's most recent visit had been three months earlier, on February 3, 2020. (AR 25, 374.) The Court cannot

---

beneficiary is capable of managing or directing the management of benefits."); *see also Christine Lee M. v. Kijakazi*, No. 2:22-CV-00012-CWD, 2023 WL 3649413, at *3–4 (D. Idaho May 24, 2023) (explaining that that a mental impairment that inhibits a claimant from managing funds relates to "management of benefits," not work-related activities). Here, the Court logically assumes that the Social Security-specific forms filled out by Dr. Donnelly and Dr. Allen were asking about Plaintiff's ability to manage funds for purposes of determining whether Plaintiff was capable of managing his benefits, and not for purposes of evaluating his ability to work. (*See* AR 458, 480.)

[10] According to Plaintiff and his father, Plaintiff sleeps most of the time, and only gets up to eat, watch YouTube or TV, smoke pot, and go to therapy sessions. (AR 242–59.)

discern whether the ALJ identified this purported inconsistency to undermine the veracity of the doctor or highlight Plaintiff's missed appointments.  Regardless, for the same reasons set forth above in evaluating Plaintiff's symptom testimony, the Court does not find this reasoning persuasive or supported by substantial evidence.  Plaintiff saw Dr. Donnelly beginning in May 2018, through April 2021, the last available record.  (AR 395–473.)  In 2020, that frequency stretched to every six to seven weeks and went back to every four to six weeks in 2021.  (AR 445, 449, 452, 469.)  In that time, Plaintiff missed an appointment in October 2018, but made it up later, and no-showed twice between July 2019 and November 2019.  (AR 438.)  Plaintiff's March 2020 appointment was cancelled due to COVID-19.[11]   (AR 448.)   At that point, Plaintiff's appointments were spaced approximately six to seven weeks apart.  (AR 449.)  Given the foregoing, the Court cannot discern any inconsistency, much less a material inconsistency, between Dr. Donnelly's opinions and his statements on Plaintiff's evaluation form.  Accordingly, based on the foregoing, the Court finds that the ALJ did not support his supportability analysis with respect to Dr. Donnelly and Dr. Allen with substantial evidence.  *See Woods*, 32 F.4th at 792.

Next, as to his consistency analysis of Dr. Donnelly's and Dr. Allen's opinions, the ALJ stated that their opinions were unpersuasive because they were inconsistent with other evidence in Plaintiff's medical records as a whole, with no further explanation.  (AR 24–26.)  An ALJ must "explain how [her or she] considered the supportability and consistency factors" in reaching his findings.  *See* 20 C.F.R. §§ 404.1520c(b), 416.920c(b).  Consistency means the extent to which a medical opinion is "consistent . . . with the evidence from other medical sources and nonmedical sources in the claim."  *See id.* §§ 404.1520c(c)(2), 416.920c(c)(2).  An ALJ errs when he does not address both factors.  *See*

---

[11]    The World Health Organization declared COVID-19 a pandemic on March 11, 2020.  *See* Centers for Disease Control and Prevention, COVID-19 Timeline, https://www.cdc.gov/museum/timeline/covid19.html [https://perma.cc/9NY8-P58D].

*Kimberli M. S. v. Kijakazi*, No. 21-cv-1836-AJB-MDD, 2023 WL 2346330, at *7 (S.D. Cal. Mar. 3, 2023) (holding the ALJ's evaluation of medical opinions was inadequate where only consistency factor, and not supportability factor, was articulated); *see also Woods*, 32 F. 4th at 792 ("The agency must . . . explain how [it] considered the supportability and consistency factors[.]" (citation omitted)); *Johnson v. Kijakazi*, No. 21-15919, 2022 WL 2593516, at *1 (9th Cir. July 8, 2022) (an ALJ should set out analysis of both supportability and consistency factors, and any other relevant factors). The requirement that an ALJ articulate his reasoning on both supportability and consistency is to allow a subsequent reviewer to trace the path of the adjudicator's reasoning. *See Kimberli M. S.*, 2023 WL 2346330, at *8 (citing 82 Fed. Reg. at 5,858 (stating that the articulation requirements in the rules allow a subsequent reviewer or reviewing court to trace the path of the adjudicator's reasoning)). The Court cannot do so here.

Accordingly, for the reasons stated above, the Court finds that the ALJ erred in evaluating the opinions of Dr. Donnelly and Dr. Allen.[12]

### C.  The ALJ Erred in Formulating the RFC

#### 1.  Parties' Arguments

Lastly, Plaintiff argues that the RFC is deficient because it omits unrejected limitations from Gregory M. Nicholson, M.D., a consultative examiner, whose opinion the ALJ found persuasive. (ECF No. 9 at 14–15.) Specifically, Plaintiff argues that the ALJ failed to incorporate—or explain why he did not incorporate—the following limitations assessed by Dr. Nicholson: (1) Plaintiff's ability to maintain regular attendance in the workplace was moderately limited; (2) Plaintiff's ability to perform work activities on a

---

[12]  The Court acknowledges that the ALJ was not required to accept Dr. Allen's opinion that Plaintiff was disabled from work. *See* 20 C.F.R. §§ 404.1520c(a), 416.920c(a); *Vertigan*, 260 F.3d at 1049 ("It is clear that it is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity."). However, the fact that a physician included an opinion on ultimate disability is not a basis for finding the provider's opinions regarding the claimant's limitations unpersuasive.

1   consistent basis was moderately limited; and (3) Plaintiff's ability to perform work

2   activities without special or additional supervision was moderately limited. (*Id.* at 15.) In

3   opposition, the Commissioner argues that the RFC is consistent with Dr. Nicholson's

4   persuasive opinion because a moderate limitation means a "fair ability" to perform the

5   activity. (ECF No. 13 at 12.) The Commissioner further argues that when an ALJ

6   translates a doctor's non-specific conclusions into specific RFC limitations, that does not

7   amount to a rejection of the opinion. (*Id.*)

8                 2.   <u>Legal Standard</u>

9         The RFC is "an assessment of an individual's ability to do sustained work-related

10   physical and mental activities in a work setting on a regular and continuing basis." Social

11   Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *1 (July 2, 1996); *see also* 20 C.F.R.

12   §§ 404.1545, 416.945. It reflects the most that a claimant can do despite his limitations.

13   SSR 96-8p, 1996 WL 374184, at *1; *see also* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

14   In formulating the RFC, the ALJ must account for all the claimant's medically

15   determinable impairments, including those that are not severe, and evaluate "all of the

16   relevant medical and other evidence." *See* 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3); *see*

17   *also Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009) (holding

18   that "an RFC that fails to take into account a claimant's limitations is defective").

19   Therefore, an ALJ errs when he provides an incomplete RFC ignoring "significant and

20   probative evidence." *Hill v. Astrue*, 698 F.3d 1153, 1161 (9th Cir. 2012).

21         An RFC assessment is ultimately an administrative finding reserved to the

22   Commissioner. *See* 20 C.F.R. §§ 404.1546(c), 416.946(c); *Vertigan*, 260 F.3d at 1049.

23   The RFC does not need to directly correspond to a specific medical opinion; rather, "the

24   ALJ is responsible for translating and incorporating clinical findings into a succinct RFC."

25   *Rounds v. Comm'r of Soc. Sec. Admin*, 807 F.3d 996, 1006 (9th Cir. 2015); *see also Stubbs-*

26   *Danielson v. Astrue*, 539 F.3d 1169, 1174 (9th Cir. 2008) (noting the ALJ's responsibility

27   to weigh conflicting medical evidence and translate accepted medical opinions into

28   "concrete restrictions"). The ALJ's RFC assessment should be affirmed if the ALJ has

applied the proper legal standard and his decision is supported by substantial evidence in the record.  *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005).

### 3.  Background

On February 10, 2022, Dr. Nicholson conducted a Psychiatric Consultative Examination of Plaintiff.  (AR 481–89.)  Dr. Nicholson opined that Plaintiff is able to understand, remember, and carry out simple one or two-step job instructions, and carry out detailed and complex instructions.  (AR 486.)  Dr. Nicholson further opined that Plaintiff is moderately limited in his ability to relate to and interact with coworkers and the public, maintain concentration, attention, persistence, and pace, accept instructions from supervisors, maintain regular attendance in the workplace and perform work activities on a consistent basis, and perform work activities without special or additional supervision.  (AR 486.)

In an attached Medical Statement of Ability to Do Work-Related Activities (Mental), Dr. Nicholson opined that Plaintiff has no restrictions in understanding, remembering, and carrying out simple instructions, or making judgments on simple work-related decisions.  (AR 487.)  Dr. Nicholson also opined that Plaintiff has mild restrictions in understanding, remembering, and carrying out complex instructions, or making judgments on complex work-related decisions due to mild cognitive deficits which showed during his exam.  (AR 487.)  Next, Dr. Nicholson opined that Plaintiff's ability to interact appropriately with supervisors, co-workers, and the public, as well as respond to changes in the routine work setting is moderately affected by his impairments due to his symptoms of bipolar disorder and anxiety.  (AR 488.)  "Moderate" was defined as follows: "Functioning in this area independently, appropriately, effectively, and on a sustained basis is fair."  (AR 487.)

In his decision, the ALJ summarized Dr. Nicholson's examination and opinions. (AR 26–27.)  He then evaluated the opinion as follows:

> The undersigned Administrative Law Judge acknowledges the findings expressed by Dr. Nicholson in his February 10, 2022, consultative psychiatric evaluation of the claimant.  It is found that his assessment is consistent with

his own findings in his examination of the claimant as well as other evidence in the claimant's medical records as a whole. For example, the claimant reported being able to drive a car, although he did not drive often and he is able to independently use public transportation. Therefore, the opinion of Dr. Nicholson is found to be persuasive.

(AR 27.)

In the RFC, the ALJ limited Plaintiff do simple, repetitive jobs in a non-public work environment. (AR 20.)

4.   Analysis[13]

As an initial matter, the Court finds that the RFC set forth above limiting Plaintiff to simple, repetitive jobs in a non-public work environment fairly accommodates Dr. Nicholson's assessed and accepted moderate limitations in Plaintiff's ability to maintain attention, concentration, persistence, and pace for extended periods and the ability to maintain socially appropriate behavior. First, the ALJ translated Plaintiff's assessed and accepted moderate limitations in maintaining concentration, persistence, and pace into the only concrete restrictions available to him. *See Stubbs-Danielson*, 539 F.3d at 1174 (finding no error where the ALJ translated the plaintiff's condition, including the accepted moderate pace and mental limitations, into the only concrete limitations available to him, *i.e.*, "simple tasks"). "[A]n ALJ's assessment of a claimant adequately captures restrictions related to concentration, persistence, or pace where the assessment is consistent with restrictions identified in the medical testimony." *Id.*

///

///

///

---

[13]   This issue is analyzed as if the ALJ had properly rejected the opinions of Dr. Donnelly and Dr. Allen and is permissibly relying on only the opinions he found persuasive in determining the RFC, *i.e.*, the opinions of Dr. Nicholson and the State Agency medical consultants. (AR 27, 29.)

Here, Dr. Nicholson opined that Plaintiff would be moderately limited in his ability to maintain concentration, persistence, and pace,[14] yet he did not identify any specific restrictions with respect to these limitations.  (AR 486.)  However, the State Agency medical consultants, A. Galluci, Psy.D. and Karen Ying, M.D., whose opinions the ALJ found persuasive and who also opined that Plaintiff would be moderately limited in his ability to concentrate, persist, or maintain pace, did elaborate on Plaintiff's capabilities.  (AR 29, 61–71, 72–83, 86–105, 106–125.)  Specifically, Dr. Galluci and Dr. Ying stated:

> Claimant is able to carry out simple and detailed instructions, maintain attention for 2-hour segments, adhere to a schedule, maintain regular attendance and be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being distracted by them, make simple work-related decisions, and complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods.

(*See* AR 69, 80, AR 99.)

According to POMS,[15] an individual who can maintain concentration and attention for 2-hour segments is capable of unskilled work and such ability is consistent with someone who is limited to understanding, carrying out, and remembering simple instructions.  *See*  POMS  DI  25020.010(B)(2)(a),  (B)(3)(d), https://secure.ssa.gov/apps10/poms.nsf/lnx/0425020010  [https://perma.cc/WE22-6TZE]; *see also Terrey v. Berryhill*, 696 F. App'x 831, 833–34 (9th Cir. 2017) (noting that the "substance of the POMS attention requirement for unskilled work is the ability to maintain attention for '2-hour segments,' . . . and . . . that 'concentration is not critical' for such work").  Accordingly, the ALJ's RFC restriction to "simple, repetitive jobs" adequately

---

[14]    In apparent contradiction, in a separate opinion issued the same day, Dr. Nicholson checked "No" when asked whether Plaintiff's abilities to concentrate, persist, or maintain pace would be affected by his mental impairments.  (AR 488.)

[15]    "The POMS does not have the force of law, but it is persuasive authority."  *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1005 (9th Cir. 2006).

incorporated Plaintiff's moderate limitations in maintaining concentration, persistence, and pace, as assessed by Dr. Nicholson. *See Terrey*, 696 F. App'x at, 833–34 (finding that moderate limitations in the ability to maintain concentration and attention for extended periods and moderately severe limitations in the ability to understand, carry out, and remember instructions are not inconsistent with an RFC assessment of simple and unskilled work); *Israel v. Astrue*, 494 F. App'x 794, 796 (9th Cir. 2012) (finding that the ALJ's RFC limitation to simple tasks adequately captured moderate limitations in concentration, persistence, or pace); *Sabin v. Astrue*, 337 F. App'x 617, 621 (9th Cir. 2009) (finding a limitation to simple and repetitive tasks on a consistent basis adequately captured the plaintiff's moderate difficulties with concentration, persistence, or pace because it was supported by the medical evidence). Moreover, the ALJ identified three unskilled occupations that Plaintiff could perform given his RFC.[16] (AR 31.)

Second, the Court finds that the RFC restriction to a "simple, repetitive jobs in a non-public work environment" adequately incorporates Dr. Nicholson's assessed moderate limitations in Plaintiff's ability to relate to and interact with coworkers and the public and accept instructions from supervisors. (AR 20, 486.) A limitation to simple routine tasks (*i.e.*, unskilled work) may adequately account for moderate difficulties in social functioning when consistent with the medical evidence and identified work-related restrictions. *See Rogers v. Comm'r of Soc. Sec. Admin.*, 490 F. App'x 15, 17 (9th Cir. 2012); *see also Garza v. Comm'r*, No. 1:21-cv-00403-BAK (SAB), 2022 WL 2974691, at *10 (E.D. Cal. July 27, 2022) (citing *Rogers*, finding limitations to unskilled work, simple and routine tasks, frequent interaction with supervisors and co-workers and occasional interaction with the public more than sufficiently addressed moderate mental limitations,

---

[16] "The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." SSR 85-15, 1985 WL 56857, at *4.

including limitations regarding interacting with others); *Ramirez v. Comm'r*, No. 1:18-cv-01322-SAB, 2019 WL 4201437, at *13, *18 (E.D. Cal. Sept. 5, 2019) (finding "a limitation to simple and routine tasks adequately encompasses a moderate limitation on social functioning"); *Gann v. Berryhill*, No. 1:17-cv-00325-SKO, 2018 WL 2441581, at *10–12 (E.D. Cal. May 31, 2018) (finding an RFC limitation to simple tasks performed in unskilled work "adequately encompasses moderate limitations with social functioning including getting along with peers and responding appropriately to supervisors"); *Henry v. Colvin*, No. 1:15-cv-00100-JLT, 2016 WL 164956, at *18 (E.D. Cal. Jan. 14, 2016) (finding "the restriction to simple tasks encompasses [the claimant's] moderate limitations with dealing with changes, social interaction, and low stress tolerance"); *Langford v. Astrue*, No. CIV S–07–0366 EFB, 2008 WL 2073951, at *7 (E.D. Cal. May 14, 2008) (finding "unskilled work . . . accommodated [the claimant's] need for 'limited contact with others'").

Here, Dr. Nicholson did not expand on his opinion, but he noted in his mental status examination that Plaintiff made "good eye contact and good interpersonal contact" and was "generally cooperative." (AR 483.) Dr. Nicholson later noted that Plaintiff's "symptoms of bipolar disorder and anxiety may interfere with interpersonal interactions." (AR 488.) Dr. Galluci and Dr. Ying, the State Agency medical consultants, similarly found Plaintiff moderately limited in his ability to get along with coworkers or peers, to maintain socially appropriate behavior, to accept instructions from and respond appropriately to criticism from supervisors, and to interact appropriately with the general public. (*See* AR 100.) However, they further opined that Plaintiff "is able to ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes in environments with limited interaction." (AR 69, 100.)[17]   Accordingly, the

---

[17]   The Court further notes that the fifth digit of the Dictionary of Occupational Titles ("DOT") occupational code for each of the jobs identified by the VE is "8," which indicates that these jobs involve the lowest level of complexity in relating to people. *See Haney v.*

Court finds that the ALJ adequately translated Dr. Nicholson's assessed and accepted moderate limitations in social functioning into Plaintiff's RFC.

Lastly, Plaintiff specifically points in his brief to the ALJ's failure to address Dr. Nicholson's assessed moderate limitations in maintaining regular attendance in the workplace, performing work activities on a consistent basis, and performing work activities without special or additional supervision.  (ECF No. 9 at 15.)  Several courts in this Circuit have held that a limitation to simple, repetitive tasks does not adequately account for moderate limitations in the ability to maintain regular attendance or complete a normal workday.  *See Macias v. Saul*, No. 1:19-CV-01187-BAM, 2021 WL 856423, at *6 (E.D. Cal. Mar. 8, 2021) (collecting cases); *Warren v. Saul*, No. 8:19-CV-02270-PD, 2021 WL 259435, at *5 (C.D. Cal. Jan. 26, 2021) (collecting cases).  However, other courts in this Circuit have found such a limitation to be sufficient.  *See, e.g.*, *Messerli v. Berryhill*, No. 1:16-CV-00800-SKO, 2017 WL 3782986, at *11 (E.D. Cal. Aug. 31, 2017) (finding limitation to "simple repetitive tasks" accounted for moderate limitations in claimant's ability to accept instructions from supervisors, interact appropriately with coworkers and the public, perform work on a consistent basis, and to complete a normal workday and workweek).

While moderate limitations do not necessarily indicate that Plaintiff is unable to adequately perform work activity, the ALJ was required to either include these limitations

---

*Saul*, No. 5:18-CV-02280-SK, 2020 WL 10965122, at *1 (C.D. Cal. Feb. 18, 2020) (citing DOT, Parts of the Occupational Definition, 1991 WL 645965); *see also* DICOT 209.687-026 (Mail Clerk), 1991 WL 671813; DICOT 529.687-010 (Basket Filler), 1991 WL 674737; and DICOT 922.687-058 (Laborer), 1991 WL 688132.  Level 8 occupations entail "[a]ttending to the work assignment instructions or orders of supervisor" and require "[n]o immediate response . . . unless clarification of instructions or orders is needed."  *See* DOT, Appendix B, Explanation of Data, People, Things, 1991 WL 688701.  Moreover, all three jobs are unskilled jobs which require only limited interaction with people.  *See* SSR 85-15, 1985 WL 56857, at *4 (stating that unskilled jobs "ordinarily involve dealing primarily with objects, rather than with data or people"); *see also* AR 31.

in Plaintiff's RFC assessment or provide legally sufficient reasons for rejecting them. *See Morinskey v. Astrue*, 458 F. App'x 640, 641 (9th Cir. 2011) (finding the ALJ erred in omitting consultant's opinion that the plaintiff was moderately impaired in the ability to maintain regular attendance, sustain an ordinary routine, and complete a normal work day or workweek without interruption without providing an explanation for why these limitations were not included in the RFC, even though ALJ claimed to give great weight to those assessments); *Christopher G. v. Saul*, No. 2:19-CV-06150-AFM, 2020 WL 2079972, at *6–7 (C.D. Cal. Apr. 30, 2020) (ALJ erred by failing to incorporate or reject physicians' opinions that the plaintiff suffered moderate difficulties in performing activities within a schedule, maintaining regular attendance, being punctual, and completing a normal workday or workweek without an unreasonable number of breaks); *Wiles v. Berryhill*, No. 2:16-CV-09558-GJS, 2017 WL 5186333, at *3 (C.D. Cal. Nov. 8, 2017*)* (finding that although moderate limitations in various areas of functioning, such as in the ability to maintain regular attendance or to complete a normal workday are not per se disabling, the ALJ erred in assessing RFC without either including the limitations or offering specific reasons for rejecting such opinions). Here, the ALJ provided no reason for failing to include the limitations in his RFC assessment. This was error.

The Court cannot conclude that the error was harmless. In posing a hypothetical claimant to the VE, the ALJ did not include Dr. Nicholson's assessed and accepted moderate limitations in maintaining regular attendance in the workplace, performing work activities on a consistent basis, and performing work activities without special or additional supervision. (*See* AR 54–56.) Moreover, in response to a question from Plaintiff's counsel, the VE opined that an individual with Plaintiff's RFC and a poor ability to remember and carryout complex instructions, to maintain concentration, attention, and focus, to perform work activities within a schedule, to maintain regular attendance, to complete a normal workday and workweek, to interact with supervisors and coworkers, and to respond appropriately with the public would be unemployable. (AR 56–57.) As such, at least on this record, the Court cannot conclude that the error was harmless. *See*

*Garrison*, 759 F.3d at 1011 ("The testimony of a [VE] is valuable only to the extent that it is supported by medical evidence" and has "no evidentiary value if the assumptions in the hypothetical are not supported by the record." (quoting *Magallanes v. Bowen*, 881 F.2d 747, 756 (9th Cir. 1989)); *Adkins v. Berryhill*, No. 8:17-CV-02205-JDE, 2018 WL 4735714, at *4 (C.D. Cal. Sept. 28, 2018) (finding error was not harmless because, in failing to either expressly reject or incorporate physician's restrictions into RFC or the hypothetical questions posed to the VE, the VE's opinion regarding claimant's ability to perform work lacked evidentiary value).

### D.   Remand Is Appropriate

Plaintiff requests that this case be remanded to the Commissioner for further proceedings. (ECF No. 9 at 23–24.) The Commissioner asks that the Court affirm the ALJ's decision, but if the Court finds harmful error, he requests that the case be remanded for further proceedings. (ECF No. 13 at 19–20.) The law is well established that the decision of whether to remand for further proceedings or simply to award benefits is within the discretion of the Court. *See, e.g.*, *Salvador v. Sullivan*, 917 F.2d 13, 15 (9th Cir. 1990); *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989); *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981). Remand is warranted where additional administrative proceedings could remedy defects in the decision. *See, e.g.*, *Kail v. Heckler*, 722 F.2d 1496, 1497 (9th Cir. 1984); *Lewin*, 654 F.2d at 635. Remand for the payment of benefits is appropriate where no useful purpose would be served by further administrative proceedings, *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004); where the record has been fully developed, *Hoffman v. Heckler*, 785 F.2d 1423, 1425 (9th Cir. 1986); or where a rehearing would unnecessarily delay the receipt of benefits, *Bilby v. Schweiker*, 762 F.2d 716, 719 (9th Cir. 1985). Here, the Court finds that this is not an instance where no useful purpose would be served by further administrative proceedings; rather, additional administrative proceedings still could remedy the defects in the ALJ's decision.

///

///

23-cv-00184-AJB-JLB

## VI.   CONCLUSION AND RECOMMENDATION

For the reasons discussed above, the Court **RECOMMENDS** that Plaintiff's merit's brief be **GRANTED**, and that judgment be entered reversing the Commissioner's decision and remanding this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

**IT IS HEREBY ORDERED** that any written objections to this Report and Recommendation shall be filed with the Court and served on all parties **no later than February 13, 2024**.   The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties **no later than February 20, 2024**.

The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.  *Turner v. Duncan*, 158 F.3d 449,445 (9th Cir 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir 1991).

**IT IS SO ORDERED.**

Dated:  January 29, 2024

Hon. Jill L. Burkhardt
United States Magistrate Judge